Ex parte Kenneth J. WASHINGTON.

No. 2–04–408–CR.

Court of Appeals of Texas, Fort Worth.

June 23, 2005.

---

John Marion Harding, Fort Worth, J., for appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Asst. Crim. Dist. Atty., Chief of the Appellate Section, Edward L. Wilkinson, D.D. Rhoden, Taylor Nguyen, Asst. Crim. Dist. Atty's, Fort Worth, for Appellee.

PANEL B: HOLMAN, GARDNER, and McCOY, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

After the trial court granted Appellant's motion for mistrial, Appellant filed an application for writ of habeas corpus alleging further prosecution was barred by double jeopardy. The trial court granted the writ, held a hearing, and denied the relief sought by Appellant. In three issues, Appellant claims the witnesses' testimony that triggered the granting of the mistrial was attributable to the State because the *mens rea* of the witnesses in violating the court's motion in limine is imputed to the prosecution, and the improper statements of the witnesses raise a claim of double jeopardy under the Texas and United States Constitutions. We affirm.

## BACKGROUND

Appellant was charged with three offenses arising out of the same incident: aggravated assault causing bodily injury to a public servant while using a deadly weapon (a motor vehicle); aggravated assault causing serious bodily injury to a public servant while using a deadly weapon (a motor vehicle); and failing to stop and render aid after becoming involved in an accident that resulted in injury to a public servant. During pretrial proceedings, the trial court granted Appellant's request that any matters involving any extraneous offense or extraneous conduct not be pre-

sented to the jury until the court had an opportunity to review the proposed testimony.

On April 19, 2004, a jury was chosen and trial on the merits began the next day. As will be discussed in detail herein, after two testifying police officers violated the motion in limine on three separate occasions by mentioning possible extraneous offenses committed by Appellant, the court granted Appellant's motion for mistrial.

On May 26, 2004, Appellant filed an application writ of habeas corpus contending that because of the improper statements of the State's witnesses, the case should be dismissed on double jeopardy grounds. The trial court granted the writ and on August 3, 2004 held a writ hearing. At the conclusion of the hearing, the trial court denied the relief sought in Appellant's application for writ of habeas corpus.

## THE THREE INSTANCES OF ALLEGED IMPROPER TESTIMONY[1]

Officer Kelley M. Caruthers from the Fort Worth Police Department testified that on February 13, 2003 he received a police broadcast concerning a possible hit-and-run driver; the broadcast named and described the suspect. The prosecutor then asked Caruthers,

Q. What name did you learn?

A. I haven't got it handy. It's a different name, Za'id Shakir, something.

Q. Okay. Did you write a report based on this?

A. No, ma'am.

Q. What did you do after you heard the initial broadcast?

A. I went to the address on Burton.

Q. Whose address did that turn out to be?

---

1. All emphasis in the quoted testimony in this opinion is supplied by the author.

A. Kenneth's mother.

Q. Do you know her name?

A. No, ma'am.

Q. How did you know it was Kenneth's mother?

A. I found out.

Q. Did she identify herself as his mother?

A. When I went up there and asked the second time.

Q. So you went there twice?

A. Three or four times.

Q. Three or four times. Initially when you went there, what type of information did you learn?

A. *I went there originally with that other name, and she said she didn't know him, and I left, and I found out that Kenneth had been to prison and changed his name.* His original name was Kenneth Washington—

MR. HARDING: Your Honor, we're going to have to object—

THE WITNESS: I'm sorry.

MR. HARDING:—to the last remark that was made by Officer Caruthers, and ask that the jury be instructed to disregard it.

THE COURT: Okay. Jury will disregard the last comment of the officer.

MR. HARDING: And also, Your Honor, we'd like to ask for a mistrial.

THE COURT: Denied.

MR. HARDING: Excuse me one moment.

(Brief pause)

MR. HARDING: Your Honor, can we approach?

(At the bench, on the record)

MR. HARDING: Your Honor, I know it was inadvertent, I'm well aware of that, and I'm sure it was inadvertent on Officer Caruthers part, but I just think it was so prejudicial of this witness, I think

we need to be heard outside the presence of the jury on that. That just slipped completely out. I'm—

THE COURT: It was clearly inadvertent.

MR. HARDING: I think it was. I don't doubt that.

THE COURT: It's not worth a mistrial, so you've got your objection and your adverse ruling.

MS. NGUYEN: And I agree it was inadvertent. I can instruct my witness—

MR. HARDING: I know that. Okay. The only thing I might do, just let everybody know, if I get real ambitious, I might check a little law and see if I can find anything. But for now I guess—

THE COURT: Your request for a mistrial is denied.

MR. HARDING: Is denied, okay. The other thing I'd ask is I think Officer Caruthers knows—I think he knows it slipped out. I got that impression, so—

THE COURT: He mumbled under his breath that he was sorry or oops. It was clearly an inadvertent statement on behalf of the officer based on what he was able to observe and hear.

MR. HARDING: Yeah, I think it was. It still has a terribly prejudicial effect on our guy.

MS. NGUYEN: Okay.

MR. HARDING: And you will instruct them to disregard?

THE COURT: I already have.

MR. HARDING: You did?

THE COURT: Yes.

MR. HARDING: Oh, one more thing. I'm sorry.

MR. DICKSON: He finds our client in a crack house. We don't want to go into that.

THE COURT: You aren't going into that, are you?

MS. NGUYEN: I was the location. I believe he can describe the address and location, but—

THE COURT: He can go into the address and location and ask if the Defendant lived there, but that's about it. We're not going into anything else. Okay?

MR. DICKSON: Can she just whisper in his ear and make sure that doesn't slip out either?

MR. HARDING: That would be fine. I'm just afraid we're so close to the jury.

THE COURT: She'll do it quietly.

Several minutes later, during the prosecutor's continued direct examination of Officer Caruthers, the following occurred:

Q. (BY MS. NGUYEN) What did you do when you saw him in the car?

A. *I told him that I had a warrant for his arrest for the criminal mischief at 5500—*

MR. HARDING: Your Honor, I'm going to have to make another objection based on that, and also—and, of course, the motion in limine, and I would ask that the jury be instructed to disregard that.

THE COURT: All right. Retire to your jury room. Let's take our midafternoon break.

(Jury not present)

THE COURT: Everyone can be seated. Where is this criminal mischief coming from?

MS. RHODEN: Mr. Harding has a motion to suppress based on his arrest. We know there was a valid warrant for his arrest. He was arrested for this.

MR. HARDING: I believe we also have a motion in limine with respect to any other crimes, acts, Your Honor.

THE COURT: Well, it's my understanding that y'all were going to give me heads up on the motion—

MS. RHODEN: The answer should have just been he had an arrest warrant.

THE COURT: Well, somebody hasn't prepped the witnesses enough to tell them what to testify to and what not to testify to. This is the second violation that we've had here. I suggest we take a break. Tell your witness what he can testify to and what he can't testify to, and we're going to come back.

MR. HARDING: Your Honor, for what it's worth, I'm sure it's inadvertent, but still, it's very prejudicial to my client.

THE COURT: So what do you want?

MR. HARDING: Mistrial.

THE COURT: Denied. That's two strikes, though.

On the next day of trial, the State called Detective Raymond D. Wilson, Jr. of the Fort Worth Police Department. Detective Wilson investigated the hit-and-run accident that occurred on February 13, 2003. He surveyed the scene, took statements from the witnesses involved, and attempted to find the suspect. He was advised that a vehicle matching the description of the hit-and-run car had been found in another location. He testified that he requested that the police tow the car to the Fort Worth auto pound. The prosecutor then continued direct examination as follows:

Q. And did you make any requests or do anything as it related to the car being in the auto pound? Did you send Detective Wangler to collect some evidence?

A. Later in the afternoon, yes.

Q. And for what purpose?

A. I was told that there was some possible identification located in the vehicle, wallet identification. *Through a subse-*

*quent interview I was also told that there may be narcotics in the vehicle.*

MR. HARDING: Your Honor, I'm going to have to object at this point.

THE COURT: The jury will retire to the jury room.

(Jury not present)

THE COURT: Mr. Harding?

MR. HARDING: Your Honor, I didn't have the opportunity since you retired the jury to request obviously an instruction to disregard, and also a mistrial, Your Honor.

THE COURT: Are you asking for that now?

MR. HARDING: Yes, indeed, I am.

THE COURT: That's granted.

MR. HARDING: Thank you, sir.

## THE WRIT HEARING

After the trial court granted the mistrial, Appellant filed an application for writ of habeas corpus asserting that because of the three separate instances of police officers improperly testifying about extraneous bad acts and prior offenses or misconduct alleged to have been committed by Appellant, further prosecution was barred under the double jeopardy clauses of the Texas and United States Constitutions. Three witnesses testified at the writ hearing: the trial prosecutors, Dawn Darice Rhoden and Trang Taylor Nguyen, and Detective Raymond D. Wilson, Jr.[2]

Trang Taylor Nguyen, co-prosecutor at Appellant's trial, testified that she had meetings with Officer Kelley Caruthers before trial. When asked whether she had told Caruthers not to mention any extraneous bad acts, misconduct, or other crimes, she replied, "I believe we warned our officers before trial." However, upon further questioning, she acknowledged that the first time she specifically remembers telling Caruthers not to mention any extraneous offense or any sort of misconduct on Appellant's part was after Caruthers had already told the jury that Appellant had been to prison and changed his name.

Dawn Darice Rhoden testified that she was the lead prosecutor in the case, and in reviewing the case with Detective Raymond Wilson before trial, she stressed to him that under no circumstances was he to mention an extraneous offense or any other bad act possibly committed by Appellant in connection with this case. However, the concept of possible narcotics being in Appellant's car was central to the State's case, so Rhoden discussed it in detail with Wilson during their pretrial meetings. During the writ hearing, Rhoden explained that the identity of the driver of the hit-and-run car was a contested issue and that she had anticipated that at some point during the trial, Wilson would testify that Appellant had told the police that his car had been stolen but that he did not report the theft to the police because there were narcotics in the car and he did not want to get into trouble. Wilson would then tell the jury that because of this statement by Appellant, Wilson looked inside Appellant's car for narcotics and found none. Rhoden testified that during her pretrial conversations with Wilson, she never specifically instructed him not to gratuitously mention the topic of possible narcotics being in Appellant's car.

Detective Raymond D. Wilson, Jr. testified at the writ hearing that prior to trial, Rhoden met with him and told him not to mention Appellant's previous criminal history, or any bad acts or extraneous of-

---

**2.** The parties' attorneys and the trial judge had previously been provided a copy of the reporter's record from the trial on the merits.

That record has been filed as a part of the appellate record in this appeal.

fenses of Appellant. However, Rhoden never told him not to testify about narcotics. He acknowledged that being in possession of narcotics is against the law. But he stated that when he made the comment in front of the jury that he had been told that there may be narcotics in Appellant's vehicle, he did not think this was an extraneous or bad act of the Appellant. His reasoning was that if Appellant's counsel had not objected and Wilson had been permitted to continue with his answer, he would have told the jury that no narcotics were discovered in Appellant's car; therefore, in his mind, he did not mention an extraneous or bad act on the part of Appellant.

At the conclusion of the writ hearing, the trial court denied the relief requested.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On September 7, 2004, the trial court issued the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. On April 20 and 21, 2003, trial was held in the above styled and numbered cause.

2. The Court granted motion in limine regarding reference to or introduction of extraneous conduct alleged to have been committed by the Defendant to allow the Court to rule on its admissibility.

3. Officer Kelly Caruthers of the Fort Worth Police Department, testifying for the State during the case in chief, testified in response to the question "... initially when you went there, what type of information did you learn?", the answer of the witness was "I went there originally with that other name, and she said she didn't know him, and I left, and I found out that Kenneth had been to prison and changed his name. His original name was Kenneth Washington ..." (R. II–165,166).

4. The defense timely objected, requested an instruction to disregard, and moved for a mistrial. The Court sustained the objection, gave the instruction to disregard and denied the motion for mistrial. The lawyers for the State, the Defendant, and the Court believed, based upon the totality of the circumstances, that the testimony of Officer Carruthers cited above, was inadvertent on the part of the witness. (R.II–166,167,168).

5. Later in his testimony, the following testimony was elicited from Officer Caruthers. "What did you do when you saw him in the car?" Officer Caruthers answered "I told him that I had a warrant for his arrest for the criminal mischief at 5500 ..." The Defense timely objected and asked that the jury be instructed to disregard the testimony of the officer. The Court retired the jury, and after admonishing the State to make sure that the witnesses did not violate the motion in limine, denied the Defendant's motion for mistrial. Again, the Defendant's counsel told the Court that he believed Officer Caruthers testimony was inadvertent. (R. II–174, 175, 176).

6. There was no request for an instruction to disregard in the presence of the jury and no request for a mistrial in the presence of the jury by the Defendant.

7. Counsel for the Defendant additionally informed the Court that he believed that there was [not?] any intentional conduct whatever on the

part of the State regarding the testimony of Officer Caruthers. (R. III–9).

8. Officer Raymond Wilson of the Fort Worth Police Department testified in the presence of the jury and the following testimony was elicited. "And for what purpose?" and the answer was "I was told that there was some possible identification located in the vehicle, wallet identification. Through a subsequent interview I was told that there may be narcotics in the vehicle." (R. III–19).

9. Counsel for the Defendant timely requested a mistrial which was granted. (R. III–19)

## CONCLUSIONS OF LAW

1. Federal law, pursuant to the holding of *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, mandates that when a defendant in a criminal trial successfully moves for a mistrial, he may invoke the bar of double jeopardy in a second effort to try him only if the conduct giving rise to the successful motion for mistrial was prosecutorial or judicial conduct intended to provoke the defendant into moving for a mistrial.

2. The Texas Constitution prohibits a subsequent trial when the prosecutor caused the mistrial either intentionally or recklessly.

3. *Bauder v. State*, 921 S.W.2d 696 (Tx. Crim.App., 1996) and *Ex Parte Bauder*, 974 S.W.2d 729 (Tx.Crim.App., 1998) also state that the prosecutor is not accountable for mistrials when the trial judge need not have granted the defendant's motion.

4. The testimony of Officer Caruthers was not presented by the prosecution in a manner to intentionally or recklessly cause a mistrial, nor done in any manner to deliberately or recklessly cross the line between legitimate adversarial gamesmanship and manifestly improper methods to render trial before the jury unfair.

5. The testimony of Officer Wilson was not presented by the prosecution in a manner to intentionally or recklessly cause a mistrial, nor done in any manner to deliberately or recklessly cross the line between legitimate adversarial gamesmanship and manifestly improper methods to render trial before the jury unfair.

6. The trial court need not have granted the defendant's motion for mistrial based upon the totality of the record. The prosecution is not accountable for the trial court's action.

7. The Defendant's Writ of Habeas Corpus is DENIED.

## DOUBLE JEOPARDY LAW

 Both the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article I, section 14 of the Texas Constitution protect a criminal defendant from repeated prosecutions for the same offense. U.S. CONST. amend. V; TEX. CONST. art. I, § 14; *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982); *Ex parte Peterson*, 117 S.W.3d 804, 810 (Tex.Crim.App.2003). Although a defendant has a "valued right to have his trial completed by a particular tribunal," neither constitutional provision guarantees that the State "will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Oregon*, 456 U.S. at 671–72, 102 S.Ct. at 2087; *Peterson*, 117 S.W.3d at 810. Thus, double jeopardy principles do not forbid multiple trials of a single criminal charge if the first trial resulted in a mistrial that: 1) was justified

under the manifest necessity doctrine; or 2) was requested or consented to by the defense, absent prosecutorial misconduct which forced the mistrial. *Peterson,* 117 S.W.3d at 810–11.

■ It is this second prong—a mistrial requested by Appellant who asserts that he was compelled to do so because of prosecutorial misconduct—that is at issue in the present case. The underlying principle is that a mistrial which the defense freely chooses to request does not bar retrial. *Id.* A mistrial that the defense is compelled to request because of manifestly improper prosecutorial conduct may, under certain circumstances, bar retrial. *Id.*

In *Peterson,* the Texas Court of Criminal Appeals set out the following three-pronged analysis to be employed by courts in analyzing a double jeopardy mistrial claim:

1) Did manifestly improper prosecutorial misconduct provoke the mistrial?

2) Was the mistrial required because the prejudice produced from that misconduct could not be cured by an instruction to disregard? And

3) Did the prosecutor engage in that conduct with the intent to goad the defendant into requesting a mistrial (*Kennedy* standard) or with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial (*Bauder* standard)?

117 S.W.3d at 816–17 (footnotes omitted).

■ When raising a double jeopardy claim on a pretrial writ of habeas corpus, the applicant bears the burden of proof under a preponderance of the evidence standard. *Id.* at 818. Therefore, Appellant must satisfy all three prongs of the analysis set out above. *See id.*

■ In reviewing the trial court's decision to grant or deny habeas relief, we must review the facts in the light most favorable to the trial judge's ruling and should uphold the decision absent an abuse of discretion. *See id.* at 819. We should afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *See id.* We also afford that same level of deference to a trial court's ruling on application of law to fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *See id.* But appellate courts review de novo those mixed questions of law and fact that do not depend upon credibility and demeanor. *Id.* Although reviewing courts should also grant deference to "implicit factual findings" that support the trial court's ultimate ruling, they cannot do so if they are unable to determine from the record what the trial court's implied factual findings are. *Id.*

■ A prosecutor's conduct is not manifestly improper if it is the result of inadvertence, sloppiness, or even simple negligence. *Id.* at 817. A prosecutor's blunder that precipitates a successful motion for mistrial does not bar a retrial. *Id.* Prosecutorial misconduct reasonably reaches only that conduct which is qualitatively more serious than simple error and connotes an intentional flouting of known rules or laws. *Id.* at 816 n. 55. If the prosecutor's conduct, viewed objectively, was not manifestly improper, then the double jeopardy inquiry ends at this first stage. *Id.* If, for example, the law itself is unsettled or the application of the law in the particular situation is debatable, the prosecutor's conduct cannot be said to be manifestly improper. *Id.*

In *Peterson,* the court of criminal appeals explained that the proper inquiry is

whether Appellant was "required to move for a mistrial because the prosecutor deliberately or recklessly crossed the line between legitimate adversarial gamesmanship and manifestly improper methods that rendered trial before the jury unfair to such a degree that no judicial admonishment could have cured it[.]" *Id.* at 816 (quoting *Ex parte Bauder,* 974 S.W.2d 729, 732 (Tex.Crim.App.1998)).

Trial and appellate courts should focus primarily upon the objective facts and circumstances surrounding the events that led to the mistrial in deciding whether the prosecutor's alleged misconduct was committed with the requisite intent or recklessness. *Id.* at 818. The court of criminal appeals provided some factors for trial and appellate courts to consider in assessing the prosecutor's *mens rea,* including:

1) Was the misconduct a reaction to abort a trial that was "going badly for the State"? In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?

2) Was the misconduct repeated despite admonitions from the trial court?

3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

4) Was the conduct "clearly erroneous"?

5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct?

*Id.* at 818–19.

## DISCUSSION

*Is the alleged misconduct of the witnesses imputed to the prosecution?*

 In his first issue, Appellant asserts that the "gross misconduct" of the two police officer witnesses should be imputed to the prosecutors and constitutes prosecutorial misconduct which precludes retrial. In support of his contention, Appellant relies solely upon *Ex parte Castellano,* 863 S.W.2d 476 (Tex.Crim.App.1993). The issue presented in *Castellano* was whether knowledge of a police officer's perjured testimony could be imputed to the State. *Id.* at 481. The court of criminal appeals stated that the State violates a defendant's right **to due process** when it actively or passively uses perjured testimony to obtain a conviction. *Id.* The court held that under the facts of the case, the police officer "acted under color of law and was, therefore, a member of the prosecution team in the investigation of the instant case and as such his knowledge of the perjured testimony was imputable to the prosecution." *Id.* at 485; *see also Ex parte Fierro,* 934 S.W.2d 370, 372 n. 2 (Tex.Crim.App.1996) ("Due process prohibits prosecutors from presenting testimony that any member of the 'prosecution team,' including both investigative and prosecutorial personnel, knows to be false."), *cert. denied,* 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997).

We find *Castellano* clearly distinguishable from the instant case because that case dealt with whether the alleged improper conduct of the police officer was a violation of due process under the Fourteenth Amendment. The court of criminal appeals held that habeas relief was properly granted, and the case was remanded to the trial court for a new trial. *Castellano,* 863 S.W.2d at 486. The case before us deals with an alleged violation of the Fifth Amendment which if proven would result in subsequent prosecution being jeopardy barred—this is significantly different from the claims raised in *Castellano.*

Appellant has not cited us to any case dealing with the issue of whether the state

of mind of a State's witness could be imputed to the State so as to preclude further prosecution under the double jeopardy principles of the Fifth Amendment to the United States Constitution or Article I, section 14 of the Texas Constitution. Indeed, in its comprehensive briefing of this issue the State has not located any Texas case dealing with this legal issue. The State points out that every federal or state court that has addressed the issue of whether a witness's state of mind should be attributed to the prosecution for the purposes of Fifth Amendment analysis has rejected such imputation.[3]

Absent any persuasive authority or rationale for enacting such a rule in Texas, we decline to hold that the knowledge of a State's witness may be imputed to the prosecution so as to constitute prosecutorial misconduct which would preclude retrial of a defendant under the Fifth Amendment to the United States Constitution or Article I, section 14 of the Texas Constitution when a claim of double jeopardy is raised following the trial court granting a mistrial. We overrule Appellant's first issue.

### Was there prosecutorial misconduct that violated State and Federal double jeopardy principles?

■ In its findings of fact, the trial court found that the two complained-of comments by Officer Caruthers were inadvertent. We have thoroughly reviewed the complained-of trial testimony that resulted in the court granting a mistrial and the evidence from the writ hearing. While we certainly cannot condone any violation of a motion in limine by any witness, we agree with the trial court that the two comments by Officer Caruthers were inadvertent, as acknowledged at the time by the prosecutor, the trial judge, *and Appellant's own counsel at trial.* Accordingly, these comments do not constitute a basis for barring retrial under double jeopardy principles.

■ Detective Wilson's testimony at trial presents a different scenario. He told the jury that "Through a subsequent interview I was also told that there may be narcotics in the vehicle," referring to the vehicle alleged to have been driven by Appellant and that was involved in the hit-and-run accident. At the writ hearing,

**3.** *See United States v. Ford,* 17 F.3d 1100, 1103 (8th Cir.1994); *United States v. McCevers,* 731 F.2d 423, 431 (7th Cir.1984); *United States v. Green,* 636 F.2d 925, 928–29 (4th Cir.1980), *cert. denied,* 451 U.S. 929, 101 S.Ct. 2005, 68 L.Ed.2d 316 (1981); *United States v. Cyphers,* 553 F.2d 1064, 1068 n. 1 (7th Cir.), *cert. denied,* 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977); *State v. Barnes,* 222 Ga. App. 875, 476 S.E.2d 646, 647 (1996); *State v. Maddox,* 185 Ga.App. 674, 365 S.E.2d 516, 517–18 (1988); *People v. Walker,* 308 Ill. App.3d 435, 241 Ill.Dec. 842, 720 N.E.2d 297, 299–301 (1999), *appeal denied,* 189 Ill.2d 678, 246 Ill.Dec. 921, 731 N.E.2d 770 (2000); *State v. Wittsell,* 275 Kan. 442, 66 P.3d 831, 837–39 (2003); *Commonwealth v. Deloney,* 20 S.W.3d 471, 474–75 (Ky.2000); *Commonwealth v. Mitchell,* 488 Pa. 75, 410 A.2d 1232, 1237 (1980); *Commonwealth v. Gravely,* 486 Pa. 194, 404 A.2d 1296, 1298–1300 (1979);

*Commonwealth v. Johnson,* 417 Pa.Super. 159, 611 A.2d 1315, 1316–17 (1992); *Commonwealth v. Yost,* 305 Pa.Super. 316, 451 A.2d 549, 550–52 (1982); *State v. Hopson,* 113 Wash.2d 273, 778 P.2d 1014, 1018–19 (1989). *See also United States v. Parton,* No. 96–5703, 1996 WL 733131, at *4 (6th Cir. Dec.18, 1996) (not designated for publication); *Berry v. Commonwealth,* No.2001–SC–0457–MR, 2003 WL 22415627, at *4 (Ky. Oct.23, 2003) (not designated for publication). *Cf. Commonwealth v. Arelt,* 308 Pa.Super. 236, 454 A.2d 108, 111–12 (1982) (misconduct of victim's family could not be imputed to prosecution); *State v. Clements,* 175 W.Va. 463, 334 S.E.2d 600, 604–05 (1985) (misconduct of sheriff's department during trial not attributable to prosecution), *cert. denied,* 474 U.S. 857, 106 S.Ct. 165, 88 L.Ed.2d 137 (1985).

Wilson explained to the court that he made this statement because he intended to rebut what he anticipated would be Appellant's alibi: that Appellant's car had been stolen and therefore he couldn't have been the driver involved in the hit-and-run accident, but that Appellant did not report his car as having been stolen because Appellant had drugs in the car. Detective Wilson testified that had he been permitted to fully explain his answer, he would have conveyed these facts to the jury and that he did not believe he was improperly testifying to extraneous or bad acts on the part of Appellant.

Assistant District Attorney Rhoden testified at the writ hearing that in her pre-trial meetings with Detective Wilson she had stressed that he should not mention any extraneous or bad acts committed by Appellant. However, she acknowledged that the issue of the identity of the driver of the hit-and-run car was hotly contested and was central to the State's case against Appellant. Therefore, the issue of narcotics being in Appellant's car was pivotal to the State's case. Rhoden discussed this issue in detail with Wilson before trial and she anticipated that sometime during trial Wilson would testify regarding the reason he searched Appellant's car for narcotics.

Although Wilson acknowledged that he intentionally made his complained-of comment, having reviewed the explanations of Wilson and the prosecutors at the writ hearing, we conclude that Appellant did not meet his burden of establishing that any manifestly improper prosecutorial misconduct provoked the request for mistrial, that the mistrial was required because the prejudice produced from that misconduct could not be cured by an instruction to disregard, and that the prosecutor engaged in that conduct with the intent to goad Appellant into requesting a mistrial or with conscious disregard for a substan-

tial risk that the trial court would be required to declare a mistrial. *See Peterson,* 117 S.W.3d at 816–17. Accordingly, a subsequent retrial would not be barred under the Fifth Amendment to the United States Constitution or Article I, section 14 of the Texas Constitution. We overrule Appellant's second and third issues.

## CONCLUSION

Because we have overruled all three of Appellant's issues, we conclude the trial court did not err in denying the habeas corpus relief sought by Appellant. We affirm the judgment of the trial court.